


**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

**ENTERED**
**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed April 3, 2007**                                              **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEBORAH K. RUSS, | § | Case No. 05-85360-7 |
| | § | |
| Debtor. | § | |
| | § | |
| DEBORAH K. RUSS, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 06-03150 |
| | § | |
| TEXAS GUARANTEED STUDENT | § | |
| LOAN CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Deborah K. Russ (the "Debtor") initiated this adversary proceeding seeking an "undue hardship" discharge, under section 523(a)(8) of the Bankruptcy Code (the "Code"), of a student loan debt she owes to Texas Guaranteed Student Loan Corporation (the "Defendant").[1] The Court has jurisdiction over the subject matter and the parties. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(I). Venue is proper. 28 U.S.C. § 1408. This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law.

For the reasons discussed below, the Court must address only one issue: whether the Debtor proved she made good faith efforts to repay the student loan debt. The Court finds that the Debtor failed to prove she made good faith efforts to repay the student loan debt. Therefore, the Court concludes that the Debtor's student loan debt is properly excepted from discharge under section 523(a)(8) of the Code.

## I. Procedural and Factual Background

The Debtor filed a voluntary petition for relief under Chapter 7 of the Code on February 15, 2006 (the "Petition Date"). Also on the Petition Date, the Debtor filed this adversary proceeding. The Court held a trial in the adversary proceeding on Wednesday, March 21, 2007. The Debtor and her doctor, Robert V. DeMartini, M.D. ("DeMartini"), testified at the trial. Based upon the evidence presented, the Court finds as follows.

Over a four year period, from August, 1994 to July, 1997, the Debtor procured eight student loans. On March 2, 1999, the Debtor filed an application to consolidate these student loans, and a consolidated loan was issued on April 4, 1999 (the "Loan"). The outstanding balance of the Loan,

---

[1] The Debtor originally filed this adversary proceeding against Neltnet, Inc. Prior to trial, Nelnet, Inc. assigned the Debtor's student loan debt to the Defendant.

**Memorandum Opinion and Order** **Page 2**

as of the trial date, is approximately $123,957.98, and the Loan continues to accrue interest at 9% per annum. The monthly payment on the loan is approximately $1,000. The Debtor never made a single payment on the Loan prior to filing for bankruptcy. However, the Loan was not in default on the Petition Date because the Debtor repeatedly sought deferments and forbearances.[2]

The Debtor used the proceeds of the Loan to attend law school from August, 1994, to May, 1998. Prior to attending law school, the Debtor worked as a dental hygienist for approximately 10 years, and she continued working as a temporary dental hygienist during and after law school. The Debtor took the Texas Bar Exam in February, 2001, and obtained her license to practice law in the State of Texas that same year. Once the Debtor became licensed to practice law, she began seeking employment in the legal field. In January, 2002, the Debtor obtained a position at Chamblee & Ryan, P.C. The Debtor found herself overwhelmed by the demands of this position and left the position after several months. In May, 2003, and again in April, 2004, the Debtor attempted to open her own law practice, but both of these ventures failed after only a few months. Throughout this entire period, the Debtor continued to work as a temporary dental hygienist.

The Debtor suffers from serious medical and emotional conditions. In 2000, the Debtor began experiencing back pain and hypertension. She sought medical attention from DeMartini for these conditions. In 2002, while still under the care of DeMartini, the Debtor began suffering from severe headaches. These headaches come upon the Debtor without warning and have debilitating effects that last for as long as two to three days at a time. Medical tests revealed that the Debtor has

---

[2] The Debtor requested deferments on October 1, 1999, November, 23, 1999, June 13, 2000, September 10, 2002, April 22, 2003, May 19, 2003, February 20, 2004, and March 1, 2005. The Debtor requested forbearances on February 15, 2001, and again on August 1, 2001. Ex. P-6, pp. 16-30.

**Memorandum Opinion and Order** **Page 3**

a brain mass. The Debtor scheduled a procedure to have a neurologist remove the brain mass; however, the procedure was later cancelled when it was discovered that the Debtor has a blood clotting disease that renders the surgery too risky. The neurologist informed the Debtor that the brain mass is located extremely close to a vein in the Debtor's brain, which adds to the riskiness of the surgery. As a result of the diagnosis of the Debtor's brain mass and blood clotting disease, the Debtor developed moderate depression and severe anxiety.[3]

Given the Debtor's medical and emotional conditions, the Debtor is not capable of working full-time and the Debtor is not capable of working in any position that requires responsibility.[4] Because the Debtor cannot have surgery to remove the brain mass, her present condition is likely to continue indefinitely.

Despite the Debtor's medical and emotional conditions, the Debtor continues to seek employment as a temporary dental hygienist. However, she can only work when she does not have a headache and is not suffering from symptoms of her depression and anxiety. Due to the sporadic nature of her employment, the Debtor earns only an average of $600 a month before taxes.

The Debtor is currently married and has two male children, one from the current marriage and one from a prior marriage. The youngest son is six years old and resides in the Debtor's home. The eldest son is twenty-one years old. He no longer resides in the Debtor's home and no longer receives any material financial support from the Debtor. The Debtor resides with her current husband, who has a high school degree and works full-time at Lowe's, earning $14 an hour before taxes. Between

---

[3] Currently, the Debtor is taking medications to manage her headaches, depression, anxiety, and blood pressure.

[4] According to DeMartini, the Debtor is only suited to work in a position analogous to a "Walmart Greeter."

the Debtor and her husband, the family earns an average monthly gross income of $2,840. Each month, $415 is taken out of the husband's paycheck for the family's health insurance. The Debtor described the family's other monthly expenses as follows:

| ITEM | AMOUNT[5] |
|---|---|
| Rent | $ 757 |
| Electricity | $ 250 |
| Water | $ 70 |
| Telephone | $ 200 |
| Car | $ 250 |
| Insurance | $ 240 |
| Groceries | $ 350-450 |
| Meals | $ 80 |
| Recreation | $ 100 |
| Medicine | $ 200-225 |
| Clothing | $ 100 |
| Childcare | $ 100 |
| Loan repayment for the eldest son | $ 68[6] |
| Tuition for the youngest son | $ 405[7] |

## II. Contentions of the Parties

The Debtor contends repayment of the Loan imposes an "undue hardship" on the Debtor and her dependents, and therefore, the Loan should not be excepted from discharge under section 523(a)(8) of the Code. The Defendant contends that the Debtor has failed to prove that repayment of the Loan would impose an "undue hardship," and thus, the Loan is properly excepted from

---

[5] The Debtor provided several slightly different versions of her family's monthly expenses: (i) her Schedule J, (ii) a December 2, 2006, answer to an interrogatory describing her average monthly expenses over the past six months, (iii) a December 2, 2006, answer to an interrogatory describing her expected expenses over the next twelve months, and (iv) her testimony at trial. The monthly expenses listed reflect those provided by the Debtor in her answer to the December 2, 2006, interrogatory asking her to describe her average monthly expenses over the past six months. While the Debtor's testimony at trial indicated some of these expenses have changed, in the aggregate, the changes were not material.

[6] On October 7, 2004, the Debtor co-signed a $5,000 educational loan on her eldest son's behalf.

[7] While this is a monthly expense, the Debtor does not necessarily pay it monthly. The Debtor apparently worked out an arrangement with the son's private school to pay the son's tuition when the family receives its tax refund or as they can.

discharge under section 523(a)(8) of the Code.

### III. Legal Analysis

Section 523(a)(8) of the Code provides that a discharge under section 727 does not discharge an individual debtor from an education loan debt unless excepting such debt from discharge would impose an "undue hardship" on the debtor and the debtor's dependents. The debtor bears the burden of proof. *In re Kettler*, 256 B.R. 719, 723 (Bankr. S.D. Tex. 2000).

In *In re Gerhardt*, 348 F.3d 89, 91 (5th Cir. 2003), the Fifth Circuit adopted the three-part "undue hardship" test articulated by the Second Circuit in *Brunner v. N.Y. State Higher Educ. Serv. Corp.*, 831 F.2d 395, 396 (2d Cir.1987). Under the *Brunner* test, a debtor must show:

> (1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans;
> (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
> (3) that the debtor has made good faith efforts to repay the loans.

*Gerhardt*, 348 F.3d at 91 (citing *Brunner*, 831 F.2d at 396).

At trial, the Defendant conceded that the first and second elements of the *Brunner* test are likely met given the severity and indefiniteness of the Debtor's medical and emotional conditions. However, the Defendant strongly disputed the third element of the *Brunner* test. Thus, the Court begins its analysis with whether the Debtor proved she made good faith efforts to repay the Loan. For the following reasons, the Court concludes that the Debtor did not prove, by a preponderance of the evidence, that she made good faith efforts to repay the Loan.

The good faith analysis requires the Court to consider the Debtor's "efforts to obtain employment, maximize income, and minimize expenses." *In re Frushour*, 433 F.3d 393, 402 (4th

Cir. 2005) (citing *O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn)*, 339 F.3d 559, 564 (7th Cir. 2003)). Accordingly, good faith "encompasses a notion that the debtor may not willfully or negligently cause [her] own default, but rather [her] condition must result from factors beyond [her] reasonable control." *In re McMullin*, 316 B.R. 70, 78 (Bankr. E.D. La. 2004) (citing *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993)) (internal quotations omitted).

In this case, the Debtor made a significant effort to obtain employment and to maximize her income. After graduating from law school, the Debtor worked as a temporary dental hygienist until she became licensed to practice law.[8] The Debtor then began seeking legal employment, obtaining employment at a law firm and attempting to open her own law practice on two separate occasions. During her search for legal employment and both attempts to open her own law practice, she continued working as a temporary dental hygienist. After her medical and emotional conditions became more debilitating, the Debtor still continued to work as a temporary dental hygienist as often as her symptoms would allow. Thus, the evidence indicates, and this Court finds, that the Debtor made significant efforts to obtain employment and maximize her income, to the extent she was able to do so.

However, the Debtor failed to prove she minimized her expenses. Of major significance is the fact that the Debtor's youngest son attends a private school with a monthly tuition of $405.[9] The

---

[8] The Debtor graduated from law school in May, 1998, but she did not sit for the Texas Bar Exam until February, 2001. While the Debtor applied to take the Texas Bar Exam on several prior occasions, she never actually sat for the examination. On those prior occasions, the Debtor studied independently, because she could not afford to participate in a commercial study course, and she did not feel properly prepared to take the examination.

[9] As noted before, while the Debtor described this is a monthly expense, it is not necessarily paid on a monthly basis. However, it is not the frequency of the payment that is relevant, but the aggregate amount paid.

Debtor offered no explanation of this expense. In other words, she did not explain why her son attended private school. Several courts have found that a debtor's decision to send a child to a private school, absent a compelling reason, indicates the debtor consciously made a decision to place herself in a position where she is unable to repay her student loan debt. *See, e.g., In re Miller*, 254 B.R. 200, 205 (Bankr. N.D. Ohio 2000) (court found a lack of good faith where the debtor paid $1,600 a year for her son's private school but did not give a satisfactory reason as to why the son needed to attend private school); *In re Conner*, 89 B.R. 744, 748-49 (Bankr. N.D. Ill. 1988) (debtor's decision to assist two daughters with tuition payments at private universities contributed to a finding of a lack of good faith); *In re Savage*, 311 B.R. 835, 841-42 (B.A.P. 1st Cir. Mass. 2004) (debtor's failure to provide a compelling reason for sending her son to private school supported a finding of a lack of good faith). Because the Debtor did not testify as to why it was necessary to send her youngest son to private school, this Court finds that the Debtor failed to prove she minimized her expenses.[10]

The steps taken by a debtor to repay the student loan debt prior to the bankruptcy are also highly relevant to the good faith analysis. *In re Alderete*, 412 F.3d 1200, 1206 (10th Cir. 2005). Courts consider whether the debtor made any payments towards the student loan debt. *Id.* Failure to make a payment is relevant but not dispositive. *In re Burton*, 339 B.R. 856, 882 (Bankr. E.D. Va. 2006) (internal citations omitted). Where a debtor has not made any payments, courts will consider whether the debtor had the funds available to make any payments. *Id.* (internal citations omitted).

Here, over an eight year period, the Debtor never made a single payment on the Loan.

---

[10] If we assume the Debtor' son began attending private school in the first grade and will continue to attend private school at a constant monthly tuition of $405 until he graduates from high school, the Debtor would pay approximately $58,000 for his private school education. This amounts to over 70% of the principal amount ($81,137) of the Loan. *See* Ex. P-6, p. 12.

However, as noted above, for some period of time, the Debtor and her husband have paid $405 a month for their youngest son's private school tuition. Moreover, the Debtor and her husband have made some monthly payments on the Debtor's eldest son's student loan.[11] These payments demonstrate an ability to make payments on the Loan. Thus, the Debtor's failure to make a single payment on the Loan supports this Court's finding of a lack of good faith.

Courts also focus on whether the debtor pursued a forbearance or a deferment, or whether the debtor attempted to renegotiate the terms of the student loan by trying to participate in an income contingent repayment program of some type ("ICR").[12] *In re Alderete*, 412 F.3d at 1206. While a debtor's request for forbearance or deferment supports a finding of good faith, *see, e.g*, *In re McMullin*, 316 B.R. at 79 (citing *In re Shankwiler*, 208 B.R. 701, 708 (Bankr. C.D. Cal. 1997)); *In re Burton*, 339 B.R. at 889, the failure to attempt to renegotiate the terms of the student loan or to participate in an ICR supports a finding of a lack of good faith. *In re Alderete*, 412 F.3d at 1206; *In re Frushour*, 433 F.3d at 403 (debtor did not act in good faith when the debtor's "only reasons for not pursuing an ICR...were that it was not suited for her and she wanted a fresh start" ); *Burton*, 399 B.R. at 887-90 (debtor's lack of understanding of how an ICR worked signified a lack of good faith).

---

[11] While the amount of this loan is only $5000.00, the Debtor apparently co-signed this loan when she knew she was unable to work as a lawyer and was barely able to work as a temporary dental hygienist.

[12] "The Income Contingent Repayment Program permits a student loan debtor to pay twenty percent of the difference between his adjusted gross income and the poverty level for his family size, or the amount the debtor would pay if the debt were repaid in twelve years, whichever is less. Under the program, the borrower's monthly repayment amount is adjusted each year to reflect any changes in these factors. The borrower's repayments may also be adjusted during the year based on special circumstances. *See* 34 C.F.R. § 685.209(c)(3). At the end of the [twenty-five] year payment period, any remaining loan balance would be cancelled by the Secretary of Education. However, the amount discharged would be considered taxable income." *In re Tirch*, 409 F.3d 677, 682 (6th Cir. 2005) (citing *In re Korhonen*, 296 B.R. 492, 496 (Bankr. D. Minn. 2003)).

**Memorandum Opinion and Order** **Page 9**

Here, the Debtor applied for forbearance eight times and deferment two times, never allowing the Loan to go into default. However, the Debtor never attempted to renegotiate the terms of the Loan with the Defendant prior to the Petition Date. Moreover, the Debtor did not seriously consider an ICR. While the Debtor did fill out an ICR form, she thought "it didn't seem very reasonable" and assumed she could not participate because she would not "live long enough" to fully pay off the Loan. The Debtor did not know, and did not research, what would happen if the Loan was not fully paid off. While there is no guarantee that the Debtor would have qualified for an ICR,[13] the Court finds that the Debtor's failure to attempt to renegotiate the terms of the Loan or to pursue an ICR evidences a lack of good faith.

Finally, courts weigh the ratio of the student loan debt to the debtor's total indebtedness as part of the good faith analysis. *In re Alderete*, 412 F.3d 1200 at 1206. A high ratio of student loan debt to total indebtedness contributes to a finding of a lack of good faith. *Id.* (98% ratio indicated a lack of good faith); *see also In re Kelly*, 351 B.R. 45, 55 (Bankr. E.D.N.Y. 2006) (70% ratio contributed to a finding of a lack of good faith). Based upon the Debtor's schedules, the Loan constituted 90.8% of the Debtor's total indebtedness on the Petition Date, which the Court finds further shows a lack of good faith. *See* Ex. P-1, pp. 12-16.

For the foregoing reasons, this Court finds that the Debtor failed to prove she made good faith efforts to repay the Loan. Given that the Debtor did not satisfy the third element of the *Brunner* test, the Court finds it unnecessary to address the first and second elements. Therefore, the Court concludes that the Loan is properly excepted from discharge under section 523(a)(8) of the Code.

---

[13] This Court believes it highly likely that the Debtor would qualify for an ICR given her medical and emotional conditions and their impact on her earning potential.

**SO ORDERED.**

**# # # END of MEMORANDUM OPINION AND ORDER # # #**